UNITED STATES DISTRICT COURT
for the
MIDDLE DISTRICT OF FLORIDA

FILED
2013 OCT 21 PM 2:48
U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

EDWIN M. WINGATE,

    Plaintiff

v.

BANK OF AMERICA, NATIONAL ASSOCIATION,

    Defendant.

Civil Action No. _____

2:13-cv-744-FtM-38DNF

## COMPLAINT

Plaintiff, EDWIN M. WINGATE (hereinafter "Wingate"), by and through his undersigned counsel, hereby sues Defendant, BANK OF AMERICA, N.A. (hereinafter "BAC"), for the improper servicing of Plaintiff's mortgage account and for violating federal consumer protection laws, and in support thereof alleges the following:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 12 U.S.C. § 2614 and 28 U.S.C. § 1331, and has supplemental jurisdiction of the state law claims regarding the same transaction and events under 28 U.S.C. § 1367(a).

2. Venue is proper in The United States District Court for the Middle District of Florida, pursuant to 28 U.S.C. § 1391.

3. Plaintiff, Wingate, is and was at all times during the events set forth herein a resident of Green Cove Springs, Clay County, Florida.

4. Defendant, BAC, is and was at all times during the events set forth herein a legal entity with sufficient contacts to subject it to personal jurisdiction in The United States District Court for the Middle District of Florida, Fort Myers Division.

5. All conditions precedent to the filing of this action have been performed or have occurred.

## PARTIES

6. Plaintiff, Wingate, is an individual who resides at 2206 Winchester Road, Green Cove Springs, Florida 32043 (the "Property"), which is his personal residence and homestead.

7. Wingate is the borrower of the mortgage loan account, secured by the Property, which is the subject of this action.

8. Defendant, BAC, is a corporation with its principal place of business in Charlotte, North Carolina. At all times material to this action, BAC regularly transacted business in the State of Florida and is a registered foreign profit corporation.

9. BAC is a "servicer" within the meaning of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §2601 et seq.

10. BAC originated the subject loan and at all relevant times has been the servicer of Wingate's mortgage loan account since June 29, 2005. A copy of Note and Mortgage is attached hereto as composite "**Exhibit A.**"

11. The owner of the subject Note and Mortgage is Federal National Mortgage Association (FNMA).

## FACTUAL ALLEGATIONS

12. From June 29, 2005, the date the loan was originated, until April 30, 2012, Wingate was current on his mortgage payments.

13. Until April 30, 2012, no escrow account had been established for the payment of property taxes and property insurance for the subject mortgage account, and Wingate personally was responsible for paying his property taxes and property insurance premium directly.

14. On April 16, 2012, BAC issued its monthly mortgage statement to Wingate, which informed him that his next monthly payment was due on May 1, 2012 in the amount of $1,852.85 or $1,945.49 if the payment is received by BAC after May 16, 2012. A copy of the mortgage statement dated April 16, 2012 is attached hereto as "**Exhibit B.**"

15. The mortgage statement dated April 16, 2012 identified payment of the homeowner's insurance premium as Wingate's responsibility and clearly noted that the homeowner's insurance premium was not due until November 13, 2012 (see **Exhibit B**, page 2).[1]

16. On May 3, 2012, Wingate made his monthly property insurance premium payment to the property insurance provider directly.

17. On May 4, 2012, BAC issued its monthly mortgage statement to Wingate for the monthly mortgage payment due in June 2012. A copy of the mortgage statement dated May 4, 2012 is attached hereto as "**Exhibit C**."

18. On or about May 4, 2012, BAC, without notice to Wingate and without his knowledge, opened an escrow account for the subject mortgage account (see **Exhibit C**).

19. According to the mortgage statement dated May 4, 2012, BAC advanced $1,024.02 to the homeowner's insurance provider on May 3, 2012 (see **Exhibit C**).

20. As of May 4, 2012, the homeowner's insurance premium was current and was being paid to the insurance provider directly by Wingate in a timely manner on a monthly basis. Wingate's homeowners insurance premium payment history is attached hereto as "**Exhibit D**")

21. BAC failed to notify Wingate of its intention of advancing funds from his mortgage escrow account for homeowners insurance.

22. On the account ledger for the subject mortgage, BAC noted and identified payment to the homeowner's insurance provider as "ADDL INS PMT." A copy of the account ledger is attached hereto as "**Exhibit E**."

23. On or about May 11, 2012, BAC issued a third mortgage statement pertaining to the monthly payment due on May 1, 2012. A copy of the mortgage statement dated May 4, 2012 is attached hereto as "**Exhibit F**."

24. On or about May 15, 2012, BAC issued a fourth mortgage statement pertaining to the monthly payment due on May 1, 2012. A copy of the mortgage statement dated May 4, 2012 is attached hereto as "**Exhibit G**."

---

[1] This information is identified on page 2, section "Home Loan Details", subsection "Escrow account expenses". Per the mortgage statement, if an escrow item is marked with an asterisk (*) then it is the responsibility of the homeowner to pay for the item marked with an asterisk (*).

25. BAC issued a total of four (4) mortgage statements pertaining to the monthly mortgage payment due on May 1, 2012. See "**Exhibits A, B, D, and E**."

26. Each of the four (4) mortgage statements pertaining to the monthly mortgage payment due on May 1, 2012, see "**Exhibits A, B, D, and E**", required Wingate to make a payment in the amount of $1,852.85 or $1,945.49 if the payment is received by BAC after May 16, 2012.

27. On or about May 17, 2012, BAC provided written correspondence to Wingate informing him that since his payment was late, the total amount due for the month of May was $1,945.50. The May 17, 2012 written correspondence is attached hereto as "**Exhibit H**".

28. On May 25, 2012, Wingate paid his monthly mortgage payment for the month of May to BAC in the amount in $1,945.50. A copy of payment verification is attached hereto as "**Exhibit I**").

29. On May 25, 2012, BAC received Wingate's monthly payment for May and described it in the mortgage account ledger as "Misc. Posting"[2], see "**Exhibit E**".

30. BAC did not properly credit Wingate's mortgage payment received on May 25, 2012 towards the outstanding principal, interest, or escrow balance and instead held the payment received in a suspense account. See "**Exhibit D**".

31. BAC has failed to demonstrate how and where Wingate's May 2012 payment was applied.

32. On or about May 15, 2012, BAC offered Wingate a trial period plan (hereinafter "TPP") under the Fannie Mae Modification Program. A copy of the TPP is attached hereto as "**Exhibit J**".

33. The TPP temporarily modified Wingate's monthly mortgage payments and directed Wingate to make reduced payments during the trial period in the amount of $1,510.33 for four months starting June 1, 2012 to September 1, 2012.

34. Wingate accepted the TPP and began making monthly payments pursuant to the TPP terms. <u>The TPP documents advised Wingate to send the modified payment required under the TPP instead of the normal mortgage payments.</u>

35. On or about May 29, 2012, BAC erroneously credited Wingate's mortgage account for another payment in the amount of $1,852.86 and simultaneously debited a late fee to Wingate's mortgage account ledger in the amount of $92.64. That very same day, BAC

---

[2] BAC describes all previous monthly mortgage payments received from Wingate as "Regular Payment".

noticed its mistake and debited Wingate's account in the amount of 1,852.86. However, BAC did not remove the late charge from the account.[3] See "**Exhibit E**".

36. On or about May 29, 2012, BAC issued its monthly mortgage statement to Wingate, informing him that his next payment was due on June 1, 2012 in the amount of $2,315.22 or $2,407.86 if paid late. A copy of this mortgage statement is attached hereto as "**Exhibit K**".

37. The mortgage statement issued on or about May 29, 2012, provides conflicting information regarding the escrow charges suddenly imposed on Wingate without notice.

38. During the month of May, BAC issued at least five (5) mortgage statements to Wingate and each mortgage statement had conflicting information regarding the escrow account, shortage in the escrow account, and the monthly mortgage payment due from Wingate.

39. This new adjusted amount took into account the newly established escrow account that included a balance of $1,024.01 "ADDL INS PMT" due to BAC's advancement of funds to the to the property insurance provider on May 4, 2012.

40. Because the TPP required Wingate to make payments in accordance with the TPP terms, Wingate made his June 1, 2012 payment in the amount of $1,510.33.

41. BAC received Wingate's June 2012 TPP mortgage payment on or about June 1, 2012, as required by the TPP. BAC thereafter reported Wingate's June 2012 payment as delinquent to the credit bureaus, notwithstanding the fact that Wingate paid it on time and in accordance with the TPP. BAC also charged a late fee for the June 2012 mortgage payment. BAC has failed to demonstrate how and where Wingate's June 2012 payment was applied.

42. BAC received Wingate's July 2012 TPP mortgage payment on or about July 2, 2012. BAC thereafter reported Wingate's July 2012 payment as delinquent to the credit bureaus notwithstanding the fact that Wingate paid it on time and in accordance with the TPP. BAC also charged a late fee for the July mortgage payment. BAC has failed to demonstrate how and where Wingate's July 2012 payment was applied.

43. BAC received Wingate's August 2012 TPP mortgage payment on or about August 1, 2013. BAC thereafter reported Wingate's August 2012 payment as delinquent to the credit bureaus notwithstanding the fact that Wingate paid it on time and in accordance with the

---

[3] Wingate paid his mortgage payment for the month of May on May 25, 2012, inclusive of the late charge; however, the payment was held in a suspense account.

TPP. BAC also charged a late fee for the August 2012 mortgage payment. BAC has failed to demonstrate how and where Wingate's August 2012 payment was applied.

44. BAC received Wingate's September 2012 TPP mortgage payment on or about September 4, 2012. BAC thereafter reported Wingate's September 2012 payment as delinquent to the credit bureaus notwithstanding the fact that Wingate paid it on time and in accordance with the TPP. BAC also charged a late fee for the September 2012 mortgage payment. BAC has failed to demonstrate how and where Wingate's September 2012 payment was applied.

45. In September 2012, BAC reported Wingate's account as 150 days delinquent to Experian and Equifax credit bureaus and reported Wingate's account as 120 days delinquent to Transunion.

46. On September 6, 2012, BAC mailed a mortgage statement to Wingate for his October 2012 mortgage payment. According to the September 6, 2012 mortgage statement, the next payment due was for the amount of $2,342.43. BAC calculated the foregoing amount by opening an escrow account for Wingate's property taxes and property insurance without notifying Wingate. Because Wingate continued to pay his property insurance and property taxes directly to the insurance provider, this additional charge by BAC was erroneous and increased Wingate's monthly mortgage payment to an amount Wingate no longer could afford.

47. Wingate made his regular mortgage payment for the month of October 2012 in the amount of $1,852.85. BAC received this payment on or around October 12, 2012. BAC processed this payment incorrectly and returned a portion of this mortgage payment to Wingate in the amount of $575.37 with a letter that stated that Wingate's payment of $575.37 was not a full monthly payment and was therefore being returned. BAC subsequently charged Wingate a late fee for the October 2012 mortgage payment. BAC also reported this payment as delinquent to the credit bureaus.

48. On October 11, 2012 BAC issued a letter to Wingate acknowledging receipt of all payments under a "Special Forbearance Agreement."[4]

49. BAC has subsequently refused to accept Wingate's October 2012 monthly mortgage payment in the amount of $1,852.85 in accordance with the terms of the mortgage. BAC has also charged Wingate late fees for each payment that Wingate has made and BAC has returned. Furthermore, BAC continues to report Wingate's payments as delinquent to the

---

[4] Based upon the circumstances, it can be assumed that BAC meant this correspondence to be in reference to TPP payments.

credit bureaus even though Wingate has attempted to make his payments and BAC refuses to accept them.

50. On or about October 12, 2012, BAC advanced $2,139.05 to the property insurance provider without notifying Wingate or without verifying if Wingate had already made arrangements to pay his monthly property insurance premium due on November 1, 2012.

51. On October 22, 2012, the property insurance provider received BAC's payment. The property insurance provider returned the funds to BAC on November 8, 2012.

52. On November 6, 2012, BAC sent to Wingate a notice of intent to accelerate with an incorrect accounting of the amounts allegedly owed by Wingate.

53. On November 9, 2012, Wingate paid his monthly property insurance premium to the property insurance provider directly.

54. On November 13, 2012, BAC advanced $2,972.19 from the escrow account for the 2012 property taxes.

55. On November 14, 2012, Wingate paid the Clay County Tax Collector in the amount of $2,972.19 for the 2012 property tax.

56. On November 29, 2012, BAC again advanced funds for the property insurance premium from the escrow account and the property insurance provider again sent the funds back to BAC on January 10, 2013.

57. BAC has utilized a suspense account for payments received from Wingate and has misapplied those payments to late fees, escrow payments that were not actually due or owing, and to other miscellaneous items.

58. On February 4, 2013, BAC issued a year end mortgage interest statement for the 2012 tax year. The amounts reported in the 2012 tax interest statement are erroneous and incorrect because Wingate's account ledger is under dispute for 2012.

59. On February 7, 2013, the undersigned law firm, on behalf of Wingate, sent to BAC via certified mail a Qualified Written Request ("QWR"), pursuant to 12 U.S.C. § 2605(e), the Real Estate Settlement Procedures Act ("RESPA"), in an attempt to resolve the mortgage accounting. A copy of the QWR is attached hereto as "**Exhibit L.**"

60. On or about March 8, 2013, BAC provided an incomplete response to Wingate's Qualified Written Request and failed to address the accounting disputes raised by Wingate. A copy of BAC's response to Wingate is attached hereto as "**Exhibit M.**"

61. On or about May 17, 2013, the undersigned filed a complaint on behalf of Wingate with the Consumer Financial Protection Bureau (CFPB) regarding BAC's continual disregard and refusal to correct its mistakes. A copy of CFPB complaint sent to CFPB is attached hereto as "**Exhibit N**".

62. A copy of the CFPB complaint was also sent to BAC directly by the undersigned counsel via certified mail on May 17, 2013.

63. On or June 22, 2013, BAC responded to the CFPB complaint and provided an incomplete and generic response to Wingate's CFPB complaint. A copy of the BAC's response to the CFPB complaint is attached hereto as "**Exhibit O**".

64. BAC has either charged Wingate for escrow payments that BAC never paid from Wingate's mortgage account or has erroneously paid such amounts which were subsequently returned to BAC by the property tax collector and property insurance provider.

65. Wingate attempted to correct the aforementioned accounting issues directly with BAC from October 2012 to January 2013; however, BAC has failed to resolve the accounting issues and has continued to report Wingate's payments as delinquent to the credit bureaus during the time he has been disputing his mortgage accounting.

66. Representatives of the undersigned law firm have called BAC on behalf of Wingate on numerous occasions to resolve these accounting issues with BAC's accounting department and escrow department. BAC representatives in the escrow and accounting departments have directed Wingate's disputes to the assigned relationship manager, Carmen Moore. Upon contacting Carmen Moore in regard to these accounting and escrow disputes, she directed Wingate's counsel to contact BAC's accounting department and escrow department.

67. BAC has refused to allow Wingate to resolve his accounting disputes directly with BAC and Wingate has expended all available means to resolve the accounting disputes directly with BAC.

## COUNT I – RESPA VIOLATIONS

68. Plaintiff hereby realleges and incorporates by reference allegations 1 through 67 set forth above, as though fully stated herein.

   *A. Defendant failed to take action with respect to Plaintiff borrower's RESPA inquiry.*

69. Under the RESPA statutes, 12 U.S.C. § 2605(e) sets forth the duties of a mortgage servicer in response to a borrower's inquiries or a QWR:

   > (2) Action with respect to inquiry. Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request…before taking any action with respect to the inquiry of the borrower, the servicer shall –
   >
   > > (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
   > >
   > > (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes –
   > >
   > > > (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
   > > >
   > > > (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or
   > >
   > > (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes –
   > >
   > > > (i) information requested by the borrower or an explanation of why the information request is unavailable or cannot be obtained by the servicer; and

9

> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

70. In the present case, BAC failed to take action in regard to Wingate's requests for accounting information and failed to address the accounting disputes raised in his QWR dated February 7, 2013.

71. On or about March 8, 2013, BAC provided an incomplete response to Wingate's QWR and failed to address the accounting disputes raised by Wingate and, to date, has refused to cooperate with Wingate or Wingate's counsel in resolving the aforementioned accounting disputes. See "**Exhibit M.**"

    B. *Defendant furnished negative information to consumer reporting agencies while investigating Plaintiff's RESPA inquiry.*

72. Under RESPA statutes, 12 U.S.C. § 2605(e)(3), a servicer is prohibited from furnishing negative information to credit reporting agencies while investigating a QWR:

> (3) During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 1681a of Title 15).

73. Wingate's QWR was received by BAC on February 12, 2013 per the certified mail return receipt.

74. BAC furnished negative information to Experian for the month of February and March 2013.

75. BAC furnished negative information to Equifax for the month of February 2013.

76. BAC furnished negative information to Transunion for the month of February 2013.

77. Because BAC furnished negative account information to the credit reporting agencies, Wingate was declined for credit on March 15, 2013 and Wingate has suffered damages to his creditworthiness and standing with the credit bureaus.

C. *Defendant established a mortgage escrow account without notice to Plaintiff and failed to properly service said mortgage escrow account.*

78. Under the RESPA statutes, 12 U.S.C. § 2605(g) describes the obligations of a servicer in regard to the administration of an escrow account:

> (g) Administration of escrow accounts. If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premium, and other charges in a timely manner as such payments become due.

79. Here, BAC owed a duty to Wingate to service his mortgage escrow account in a reasonable manner and in accordance with the aforementioned federal statute.

80. BAC failed to properly service the mortgage escrow account by disbursing payments from the mortgage escrow account that were not actually due or were premature.

81. Because BAC erroneously and prematurely disbursed payments from the mortgage escrow account, Wingate's monthly mortgage payments have been increased to an incorrect and unaffordable amount.

82. Furthermore, BAC's refusal to accept the regular and correct mortgage payments from Wingate and its erroneous reporting of his payments as delinquent to the credit bureaus, Wingate's creditworthiness has been unfairly damaged.

83. As such, BAC's violation of the RESPA regulations and its failure to properly service the mortgage escrow account has directly caused Wingate to suffer financial harm.

D. *Defendant failed to provide the requisite notifications to Plaintiff regarding his mortgage escrow account.*

84. Under the RESPA statutes, 12 U.S.C. § 2609(b) a loan servicer is required to provide a borrower with notification of a shortage in an escrow account.

85. In the instant case, BAC failed to provide notifications to Wingate regarding the establishment of a mortgage escrow account or any shortages therein, and BAC has failed to disclose such disputed amounts requested in Wingate's QWR, as required under 12 U.S.C. § 2609, et seq.

86. Furthermore, BAC's disbursement of payments not actually due or were premature caused significant errors in the mortgage accounting, and BAC continues to refuse to address these accounting errors.

87. Likewise, BAC relied on its erroneous accounting to report Wingate's payments as delinquent to the credit bureaus.

88. Because of BAC's erroneous reporting to the credit bureaus, its failure to correct its errors after being notified properly through Wingate's QWR, and through other channels, Wingate has suffered damages to his creditworthiness and standing with the credit bureaus, and he potentially faces a foreclosure of his mortgage.

89. Furthermore, BAC's irresponsible and unreasonable conduct has directly caused Wingate to suffer the following damages: charges for premature tax bills and insurance premiums; erroneous late fees; damage to his financial reputation and credit score; inability to secure new credit[5] or refinance existing debt; inability to take advantage of alternate loan modification programs sponsored by and through United States governmental agencies, and costs and fees associated with hiring an attorney to bring this action.

90. Wingate has retained the Law Office of Conrad Willkomm, P.A. and is obligated to pay reasonable attorney's fees and costs for services rendered.

**WHEREFORE**, Wingate respectfully requests that this Honorable Court grant the following relief:

1) enter judgment in Wingate's favor;

2) determine the correct amount of money due to BAC under the terms of the Note and Mortgage and any subsequent agreement(s) between the parties;

3) determine the amount of money, if any, due BAC for escrow advances on behalf of Wingate;

4) award Wingate his costs and reasonable attorney's fees and costs, pursuant to 12 U.S.C. 2605(f);

5) award additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of 12 USC § 2605; and

---

[5] Wingate applied for a Home Depot credit card on March 15, 2013, but his credit application was denied because of his low credit score and delinquent accounts recently reported to the credit bureaus.

6) award Wingate any other relief that the Court deems just, necessary, and/or proper.

## COUNT II – FLORIDA CONSUMER PROTECTION ACT

91. Plaintiff hereby realleges and incorporates by reference allegations 1 through 67 set forth above, as though fully stated herein.

92. BAC owed a duty to Wingate under Florida Statues § 501.137(2), which states, "If an escrow account for the taxes or insurance premiums is deficient, the lender shall notify the property owner within 15 days after the lender receives the notification of taxes due from the county tax collector or receives the notification from the insurer that a premium is due."

93. BAC breached its duty to Wingate by failing to provide him with any notice of an escrow deficiency prior to advancing the property insurance premium and the 2012 property tax payments from the escrow account, as required under Florida law.

94. Due to BAC's improper administration of Wingate's mortgage account, Wingate suffered damages in the form of late charges and delinquency showings on his credit report.

95. BAC's irresponsible and unreasonable conduct has directly caused Wingate to suffer the following damages: charges for premature tax bills and insurance premiums; erroneous late fees; damage to his financial reputation and credit score; inability to secure new credit[6] or refinance existing debt; inability to take advantage of alternate loan modification programs sponsored by and through United States governmental agencies, and costs and fees associated with hiring an attorney to bring this action.

96. But for BAC's failure to properly administer Wingate's mortgage escrow account, Wingate would not have suffered the aforementioned financial damages.

97. Wingate has retained the Law Office of Conrad Willkomm, P.A. and is obligated to pay reasonable attorney's fees and costs for services rendered.

**WHEREFORE**, Wingate respectfully requests that this Honorable Court grant the following relief:

1) enter judgment in Wingate's favor;

---

[6] Wingate applied for a Home Depot credit card on March 15, 2013, but his credit application was denied because of his low credit score.

2) determine the correct amount of money due to BAC under the terms of the Note and Mortgage and any subsequent agreement(s) between the parties;

3) determine the amount of money, if any, due BAC for escrow advances on behalf of Wingate;

4) award Wingate his costs and reasonable attorney's fees and costs; and

5) award Wingate any other relief that the Court deems just, necessary, and/or proper.

## COUNT III – BREACH OF CONTRACT

98. Plaintiff hereby realleges and incorporates by reference allegations 1 through 67 set forth above, as though fully stated herein.

99. BAC is the originating lender (i.e., an original party to the subject note and mortgage contracts) as well as the current servicer of the subject loan.  See "**Exhibit A**."

100. BAC acted in bad faith and in contravention of Wingate's reasonable expectations under the Note and Mortgage contracts by failing to manage and service Wingate's mortgage account in reasonable manner.

101. BAC breached its duty under the Note and Mortgage contracts by failing to manage and service Wingate's loan account in a reasonable manner, by failing to take action in regard to Wingate's requests for accounting information, and by failing to address the accounting disputes raised in his QWR dated February 7, 2013.

102. Likewise, BAC breached its duty under the Note and Mortgage contracts by failing to manage Wingate's loan account in a reasonable manner and by failing to properly service the mortgage escrow account in that it disbursed payments from the mortgage escrow account that were not actually due or were premature.

103. BAC's irresponsible and unreasonable conduct has directly caused Wingate to suffer the following damages: charges for unreasonable and premature tax bills and insurance premiums; erroneous late fees; and costs associated with hiring an attorney bring this action.

104. Furthermore, because of BAC's refusal to accept the regular and correct mortgage payments from Wingate, its erroneous reporting of his payments as delinquent to the credit bureaus and its premature disbursement of such funds from the mortgage escrow account,

Wingate's monthly mortgage payments have been increased to an incorrect and unaffordable amount and he potentially faces a foreclosure of his mortgage.

105. BAC's irresponsible and unreasonable conduct has directly caused Wingate to suffer the following damages: charges for premature tax bills and insurance premiums; erroneous late fees; damage to his financial reputation and credit score; inability to secure new credit[7] or refinance existing debt; inability to take advantage of alternate loan modification programs sponsored by and through United States governmental agencies, and costs and fees associated with hiring an attorney to bring this action.

106. BAC knew or should have known that it had no reasonable basis for: 1) failing to provide Wingate with notification regarding the establishment of an escrow account and any shortages therein; 2) advancing and disbursing payments from the mortgage escrow account that were not actually due or were premature; 3) failing to take action in regard to Wingate's multiple oral and written requests for accounting information; and 4) failing to address the accounting disputes raised in his QWR dated February 7, 2013.

107. But for BAC's irresponsible and unreasonable conduct, which constitutes a breach its duty of good faith and fair dealing under the subject Note and Mortgage contracts, Wingate would not have suffered the foregoing financial damages.

108. Wingate has retained the Law Office of Conrad Willkomm, P.A. and is obligated to pay reasonable attorney's fees and costs for services rendered.

**WHEREFORE**, Wingate respectfully requests that this Honorable Court grant the following relief:

1) enter judgment in Wingate's favor;
2) determine the correct amount of money due to BAC under the terms of the Note and Mortgage and any subsequent agreement(s) between the parties;
3) determine the amount of money, if any, due BAC for escrow advances on behalf of Wingate;
4) award Wingate his costs and reasonable attorney's fees and costs; and
5) award Wingate any other relief that the Court deems just, necessary, and/or proper.

[7] Wingate applied for a Home Depot credit card on March 15, 2013, but his credit application was denied because of his low credit score.

_____
Terai L. Griffith-Spence, Esq.
FBN: 98976
*Co-Counsel for Plaintiff*
LAW OFFICE OF CONRAD WILLKOMM, P.A.
3201 Tamiami Trail North, Second Floor
Naples, FL 34103
Tel: (239) 262-5303
Fax: (239) 262-6030
Email Service to:   terai@swfloridalaw.com

_____
Conrad Willkomm, Esq.
FBN: 697338
*Co-Counsel for Plaintiff*
LAW OFFICE OF CONRAD WILLKOMM, P.A.
3201 Tamiami Trail North, Second Floor
Naples, FL 34103
Tel: (239) 262-5303
Fax: (239) 262-6030
Email Service to:   conrad@swfloridalaw.com